## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| AARON CANTÚ AND ALEXEI WOOD,<br><br>       Plaintiffs,<br><br>  v.<br><br>DISTRICT OF COLUMBIA AND CHIEF PETER NEWSHAM<br> c/o Office of the Attorney General<br> 441 4th Street NW<br> Washington, D.C. 20001,<br><br>       Defendants. | Case No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES
### (Violation of constitutional and D.C.-law rights of Inauguration Day demonstrators)

### INTRODUCTION

On January 20, 2017, Donald J. Trump was sworn in as President of the United States. Exercising their constitutional right to freedom of speech and assembly, people from all over the country took to the streets of the nation's capital to express their disapproval of his policies. Journalists came to report on the demonstrations. Legal observers came to document any violations of the demonstrators' legal rights.

During demonstrations in the District of Columbia that day, several acts of vandalism occurred. In response, the District's Metropolitan Police Department (MPD) rounded up and arrested hundreds of people, including people who engaged in no illegal activity, by chasing them and blocking streets to force them into a confined area (a "kettle") on a D.C. street corner. During the chase and then while detaining demonstrators for hours, police fired pepper spray, stingballs, and flash-bang grenades at crowds of demonstrators, journalists, and legal observers, frequently without warning or justification. In the course of the roundup and subsequent processing of

demonstrators, police held detainees for hours without food, water, or access to toilets; handcuffed detainees so tightly as to cause injury or loss of feeling; and subjected some detainees to manual rectal jabbing. Much of MPD's misconduct has been independently documented by the District of Columbia's Office of Police Complaints.

Plaintiffs are journalists who traveled to D.C. to cover the demonstrations. Plaintiffs suffered the constitutional, statutory, and common law violations described here.

For example, MPD and its officers pepper-sprayed Plaintiffs while they were attempting to leave the demonstration, which they were covering as journalists.  Neither Plaintiff posed a threat nor broke the law.  Plaintiffs were subsequently arrested even though they were not participating in any unlawful activity.  Plaintiffs did not engage in any acts of vandalism.  They were present as journalists to document the events of the day when they were caught up in the stampede created by MPD's pursuit of the demonstrators and its use of chemical irritants. Several times multiple MPD officers pepper-sprayed into a large and peaceful crowd of individuals without warning and for no apparent reason other than they were standing near the corner where MPD was detaining demonstrators.  Pepper spray and other chemical irritants were used against Plaintiffs without justification and without warning. While Plaintiffs were detained on a D.C. street corner and later in police transport vehicles, they were unreasonably denied food, water, and access to a toilet for up between 16 and 36 hours.  Arresting officers unnecessarily prolonged the arrest process to keep Plaintiffs in a state of anxiety, hunger, thirst, and other discomfort.

To obtain compensation for their injuries and to vindicate their rights under the First, Fourth, and Fifth Amendments to the Constitution and the common law, Plaintiffs now seek relief in this Court.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the plaintiffs' claims arise under the First, Fourth, and Fifth Amendments to the United States Constitution and are asserted here pursuant to 42 U.S.C. § 1983. Plaintiffs' claims under the statutory and common law of the District of Columbia arise from the same events as the constitutional claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the events giving rise to all claims occurred in the District of Columbia.

## PARTIES

3.      Plaintiff Aaron Cantú is an adult freelance journalist and editor.  His work has been published widely online and in written periodicals and newspapers since 2013.  Originally a New York-based reporter, Plaintiff moved to New Mexico for a newspaper job to ease the pain and discomfort, as well as the undue attention, caused by the incidents described herein and then eventually moved to Los Angeles.  On January 20, 2017, he was in Washington, D.C. to report on the Inauguration Day demonstrations in his capacity as a freelance journalist.

4.      Plaintiff Alexei Wood is an adult freelance photojournalist.  Mr. Wood has photography portfolios of protest documentation since 2008. He has work published in online and print periodicals. Originally based in San Antonio, Wood moved to Oregon to start anew from stresses, pain, discomfort from the trauma of pepper spray attack and arrest caused by the incidents described herein as well as trauma from severe undo attention from both the arrest as well as going to trial, Nov. 15-Dec 21, 2017. On January 20, 2017, he was in Washington, D.C. to report on and photograph the Inauguration Day demonstrations in his capacity as a freelance photojournalist.

5.      Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs the MPD pursuant to the laws of the District of Columbia. In this case, the District of Columbia acted through its agents, employees, and servants.

6.      Defendant Peter Newsham is the Chief of the D.C. Metropolitan Police Department. At the time of the events at issue, he was the Interim Chief of Police and was acting within the scope of his employment and under color of law of the District of Columbia. He supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

## FACTS

### *Police Weapons*

7.      On Inauguration Day 2017, MPD officers who interacted with demonstrators were equipped with several types of chemical or other weapons, including:

*a.*      Oleoresin Capsicum spray dispensers, which resemble small fire extinguishers containing 14-48 ounces of solution, with a typical range of 25- 30 feet. The solution, commonly known as pepper spray, produces a burning sensation on a person's skin and in a person's eyes and lungs, vision problems, and breathing problems, including coughing and choking.

*b.*      "Stingballs," which are explosive devices that release smoke, rubber pellets, and a chemical irritant within a radius of approximately 50 feet.

*c.*      Smoke flares, which are explosive devices that release smoke.

*d.*      Concussion grenades, which are devices that produce loud explosive noises.

*e.*      Flash-bang grenades, which are devices that produce loud explosive noises and bright flashes of light.

   *f.*  Long range acoustic devices, or LRADs, which are devices that emit an excruciatingly loud tone.

*Demonstrators March Down 13th Street NW*

  8.  On January 20, 2017, thousands of people demonstrated in the District of Columbia to express their opposition to the new President.

  9.  The overwhelming majority of the demonstrators were peaceful and law-abiding.

  10.  Between 10 a.m. and 11 a.m. on January 20, hundreds of demonstrators walked south on 13th Street NW from Logan Circle toward the National Mall.

  11.  The number of demonstrators walking down 13th Street NW was sufficiently large that they took up two or three blocks.

  12.  Plaintiffs were walking alongside the demonstrators to report on the demonstration for journalistic purposes. They intended to sell their writings (and in the case of Wood photos) commercially, and they had a well-founded expectation that he would be able to do so.

  13.  Mr. Cantú was wearing dark jeans, a black hooded sweatshirt with the hood down, and a pink shirt.

  14.  Mr. Wood was wearing dark jeans, a black hooded sweatshirt with Press on the front, a black rain jacket, grey boots, and a black bicycle helmet.

  15.  Between 10 a.m. and 11 a.m. on January 20, some demonstrators engaged in acts of vandalism on or near 13th Street NW between Logan Circle and Franklin Square.

  16.  Mr. Cantú and Mr. Wood were both not wearing a hood. Mr. Cantú was wearing a mask around his nose and mouth, as is recommended by the Reporters Committee for Freedom of the Press for reporters who have a reasonable expectation of pepper spray or tear gas use by police. Mr. Wood was not wearing a mask.

*The Police Assault*

17.     When demonstrators began to march down 13th Street NW from Logan Circle, MPD had approximately 100 officers present, including Cmdr. Keith Deville, along with approximately ten police vans and five or six additional police vehicles.

18.     Cmdr. Deville was the on-scene commander who directed the MPD officers on the ground as they responded to the march.

19.     Cmdr. Deville, in turn, received orders from top MPD officials in MPD's command center.

20.     Among the officials directing Cmdr. Deville from the command center was Asst. Chief Lamar Greene.

21.     Defendant Chief Peter Newsham has acknowledged that he was stationed in the command center on January 20.

22.     On information and belief, Chief Newsham himself was overseeing and directing the actions of Asst. Chief Green, Cmdr. Deville, and other top MPD officials as they, in turn, directed MPD's actions regarding the demonstrators who marched down 13th Street NW between 10 a.m. and 11 a.m. on January 20.

23.     MPD officers witnessed acts of vandalism on and around 13th Street NW and made Cmdr. Deville, Asst. Chief Greene, and (on information and belief) Chief Newsham aware of these acts.

24.     Cmdr. Deville, under the direction of Defendant Chief Newsham and Asst. Chief Greene did not order MPD officers to identify or apprehend individuals committing acts of vandalism.

25.     Instead, approximately 15 minutes after demonstrators began to march south down 13th Street NW, and after a few acts of vandalism had been committed by a few people, Cmdr. Deville declared to MPD officers that the march was a "riot" and ordered MPD officers to stop the marchers from continuing further south.

26.     Cmdr. Deville received the order to stop the march from Asst. Chief Greene at the command center, where (on information and belief) he received direction from Chief Newsham.

27.     Cmdr. Deville knew that not all of the individuals who were marching were committing acts of vandalism when he declared the march a "riot." He was also aware that some of the individuals walking down 13th Street NW were journalists photographing and documenting the march.

28.     Throughout the time when demonstrators were moving south on 13th Street NW, both before and after acts of vandalism occurred, some individuals joined the march and others left it. Not all individuals who were part of the march were aware of the acts of vandalism that occurred.

29.     Neither when Cmdr. Deville declared a "riot" nor at any time for the rest of the day, did Cmdr. Deville or his supervisors — from Chief Newsham and Asst. Chief Greene to the officers on the ground — distinguish or attempt to distinguish between individuals who were peacefully exercising their First Amendment rights and individuals who were committing unlawful acts.

30.     A number of MPD officers had ready access to bullhorns and to loudspeakers on their vehicles.

31.     Nonetheless, at no time did Chief Newsham, Asst. Chief Greene, Cmdr. Deville, or any other MPD official order that demonstrators be given a dispersal order, be given an opportunity

to disperse, or be given a safe route to disperse. No order to disperse, opportunity to disperse, or safe route to disperse was ever provided.

32.     Instead, Cmdr. Deville, under the direction of Defendant Chief Newsham and Asst. Chief Greene, ordered that MPD officers use pepper spray against the demonstrators.

33.     Among MPD officers' weapons for discharging pepper spray on January 20 were large canisters that fire a steady stream of pepper spray as if from a small hose. Officers refer to these weapons as "supersoakers."

34.     Cmdr. Deville told his officers: "any time you need pepper [spray], use it."

35.     A few minutes later, Cmdr. Deville, under the direction of Defendant Chief Newsham and Asst. Chief Greene, authorized the use of stingballs, which shoot out rubber pellets and chemical irritants at people.

36.     At their commanders' orders, MPD officers used stingballs, "supersoakers," pepper spray, and noise-emitting crowd-control devices against the demonstrators.

37.     At least some of the time, officers fired chemical irritants at people without regard for whether these weapons were necessary to prevent unlawful conduct or subdue a person who was resisting officers.

*Plaintiffs Are Unjustifiably Pepper Sprayed*

38.     As MPD officers confronted demonstrators at Franklin Square, many demonstrators and Mr. Cantú moved away from the police down streets to the east and south of Franklin Square.

39.     As Mr. Cantú and a number of demonstrators ran away from the police assault, MPD officers confronted them on the streets immediately east and/or south of Franklin Square and

discharged pepper spray, flash-bang grenades, concussion grenades, stingballs, smoke flares, and LRADs at demonstrators and other individuals in the vicinity, including Plaintiff Cantú.

40.     Mr. Wood was pepper-sprayed in police kettle.

41.     Using pepper spray, flash-bang grenades, concussion grenades, stingballs, smoke flares, and LRADs, MPD officers chased Mr. Cantú and many of the demonstrators back toward Franklin Square.

42.     As a result of the pepper spray, Mr. Cantú choked and gasped for breath. As the pepper spray flooded his eyes, they began to burn.

*Continued Police Assault and Mass Detentions*

43.     On or near 13th Street NW, MPD officers deployed pepper spray and/or stingballs against individuals without warning or a dispersal order, often in circumstances where the officers faced no threat to themselves or to public safety or disobedience of any commands they had given.

44.     Although Mr. Cantú and Mr. Wood had not committed any unlawful act, the police conduct put each of them in fear for their safety, causing them to run away from the police, ultimately heading north on 14th Street NW.

45.     Cmdr. Deville, under the direction of Chief Newsham and Asst. Chief Greene, ordered MPD officers to block numerous alternative egress routes in order to force Mr. Cantú, and many other demonstrators to flee north up 14th Street NW and then east on L Street NW to the corner of 12th and L Streets NW. Newsham, Greene, and Deville thus caused MPD officers to act in a coordinated manner to funnel individuals to that location.

46.     Cmdr. Deville, under the direction of Chief Newsham and Asst. Chief Greene, ordered MPD officers to establish a blockade at the corner of 12th and L Streets NW to trap individuals proceeding east on L Street NW.

47.     Ofcrs. Michael Howden, Gregory Rock, Daniel Thau, Tim Rice (172 or 173 badge number), and Melvin Washington were among the MPD officers who established the blockade.

48.     Sgt. Anthony Alioto was among the MPD officers who supervised the establishment of the blockade.

49.     Although some individuals on L Street NW managed to escape by evading the MPD blockade before it closed in, Mr. Cantú, and most of the other individuals on L Street NW were detained by police at the northwest corner of 12th and L Streets NW and on L Street NW itself. Mr. Cantú was pepper-sprayed as he attempted to leave the demonstration from L Street NW.

50.     Mr. Cantú eventually observed police begin to arrest journalists holding professional quality cameras. Considering that he only had a pen and paper, he realized he was likely to be arrested regardless of his role as a journalist, and decided the best course of action would be to not speak with police.

51.     MPD officers detained more than 200 individuals in the cordoned area (the "kettle") they had created at 12th and L Streets NW.

52.     Neither the MPD officials who ordered the creation of the kettle — including Newsham, Greene, and Deville — nor the MPD officers who established the kettle — including Ofcrs. Howden, Rock, Thau, Alioto, Rice, and Washington — took any actions to try to ensure that only individuals whom they had probable cause to believe had committed crimes would be detained in the kettle.

53.     Chief Newsham (on information and belief), Asst. Chief Greene, and Cmdr. Deville were aware that the size of the march had fluctuated dramatically since demonstrators left Logan Circle, and they were aware that numerous demonstrators had joined or left the march throughout its disorganized progress until the point at which a number of demonstrators were forced into the

kettle and prevented from leaving. Chief Newsham, Asst. Chief Greene, Cmdr. Deville, and the officers involved in forming the kettle had no ability to identify which, if any, of the kettled individuals had committed crimes. Chief Newsham, Asst. Chief Greene, and Cmdr. Deville knew that neither they nor their officers had the ability to identify which, if any, of the kettled individuals had committed crimes.

54.     As Cmdr. Deville subsequently testified regarding the decision to detain demonstrators, "I wasn't differentiating who was demonstrating and who was rioting."

55.     Chief Newsham later acknowledged to the Washington Post that his officers strategically maneuvered the demonstrators to trap them in the kettle. The MPD official in charge at the scene, Cmdr. Deville, was in constant contact with the MPD command center, where Defendant Newsham was stationed throughout the day. On information and belief, Defendant Newsham ordered or approved trapping demonstrators in the kettle at the time this action took place, and/or approved the continued detention and arrest of the kettled demonstrators despite his awareness that the police had no ability to identify which, if any, of these individuals had committed crimes.

56.     Because of Defendants' intentional and coordinated action in chasing individuals north on 14th Street NW, then east on L Street NW, while driving them on by using pepper spray, flash-bang grenades, concussion grenades, and stingballs, and blocking their egress via alternate routes, the individuals who were trapped in the kettle at 12th and L Streets NW were not there by virtue of having acted unlawfully but merely because they were present on particular downtown D.C. streets on the morning of January 20 and then tried to flee when police chased and assaulted them.

57.     Mr. Cantú and Mr. Wood did not engage in any vandalism or other unlawful activity on the streets of Washington, D.C. on January 20, 2017.

58.     Mr. Cantú was detained in the kettle without probable cause and merely because he was exercising his First Amendment right to document the demonstrations as a journalist, was present on particular downtown D.C. streets on the morning of January 20, and tried to run away when police officers chased and assaulted him.

*In the Kettle*

59.     The kettle of detainees at 12th and L Streets NW was formed at about 10:45 a.m.

60.     Plaintiffs were detained there along with approximately 200 other individuals.

61.     Plaintiffs were detained in the kettle for hours.

62.     Cmdr. Deville, under the direction of Defendant Chief Newsham and Asst. Chief Greene, declared that all the detainees were under arrest and ordered that no one was to leave the kettle.  Ofcr. Howden and Sgt. Alioto were among those primarily responsible for ensuring that the detainees could not leave.

63.     While individuals were detained in the kettle, MPD officers repeatedly deployed pepper spray and stingballs containing chemical irritants against individuals or groups of individuals in the kettle, including Plaintiffs.

64.     Many of these deployments came without warning or dispersal order— indeed, the individuals in the kettle were physically prevented from dispersing—and were carried out when there was no threat to officer or public safety or any disobedience of police orders on the part of the detainees.

65.     Ofcr. Howden remarked to his supervisor that the police had been "extremely wild" with their use of pepper spray.

66.     Although Plaintiffs are unsure whether they were targeted personally by any of the officers' uses of pepper spray or stingballs, the tight packing of the detainees into a small space ensured that everyone in the kettle would feel the effects of spray directed at the crowd of detainees.

67.     The pepper spray and other chemical irritants were so thick that at times they created a haze over the kettle and all the individuals detained there.

68.     The repeated deployment of chemical irritants caused panic among the kettled detainees, including Plaintiffs, because they were having difficulty breathing, were tightly pressed together with other detainees, and could not escape the kettle.

69.     Each time Plaintiffs were hit with pepper spray or other chemical irritants, their eyes began to burn painfully, and he began to cough and to gasp for breath.

70.     Asst. Chief Robert Alder, Cmdr. Jeffery Carroll, and Lt. Paul Niepling supervised the continued maintenance of the kettle. These officials continued to communicate with and receive orders from the MPD command center, where Defendant Chief Newsham was overseeing the operation.

71.     During the many hours that Plaintiffs were detained in the kettle, MPD officers, under the supervision and direction of Chief Newsham, Asst. Chief Alder, Cmdr. Carroll, and Lt. Niepling, failed to provide them with food, water, or access to a toilet.

72.     Many demonstrators, including Plaintiffs, specifically requested food, water, and/or access to a toilet.

73.     While the detainees were kettled, several MPD officers ate boxed sandwiches and then threw edible food in a garbage can in view of the detainees, including Plaintiffs, to taunt them.

74.     One MPD officer made clear to the detainees that no toilets would be made available by stating in response to one detainee's request that she should "shit [her] pants" to prove she needed a toilet.

75.     Having no other place to urinate, some of the demonstrators urinated on the street or against the side of buildings. Some demonstrators rummaged in the trash for empty bottles in which to urinate. One demonstrator crouched against the side of a building and defecated into a paper bag.  One demonstrator urinated on Mr. Cantú's backpack

76.     Mr. Cantú badly needed to use a toilet, but, fearing that he could be charged with public urination, did not dare to urinate on the street.

77.     Holding his bladder was painful for Mr. Cantú.

78.     Mr. Wood was pepper-sprayed in police detention causing severe difficulty breathing, panic, mental confusion, and emotional trauma.

79.     Within 30 to 45 minutes of the formation of the kettle, by 11:30 a.m., MPD had prisoner vans and processing officers at the scene and was ready for the processing of detainees.

80.     Nonetheless, the handcuffing of detainees and placing them into vehicles for transport to detention facilities stretched on for hours, with some of the detainees, including Plaintiffs, remaining at the corner of 12th and L Streets NW until the evening.

81.     The gap in time between the point at which MPD was prepared to take detainees into formal custody and the point at which the detainees were actually processed reflects that MPD officers, under the supervision and direction of Chief Newsham, Asst. Chief Alder, Cmdr. Carroll, and Lt. Niepling, purposefully conducted the arrest process unnecessarily slowly to maximize the detainees' discomfort.

*The Formal Arrests*

82.     When Mr. Cantú was formally arrested, the MPD officer handcuffed him using zipties so excessively tightly that he lost feeling in some of the fingers on both of his hands.

83.     Plaintiffs complained that the zipties were painfully tight, but the officer refused to remove them, explaining that the zipties were not supposed to be comfortable.

84.     Plaintiffs complained that the pain was excruciating but was ignored.

85.     At some point a police sergeant stated that there would be no bathrooms, stating that Plaintiff and others "shouldn't have come to DC and destroyed a Starbucks."

86.     Plaintiffs' zipties were not removed for approximately four hours. They and nine others were forced to sit in the back of a cramped police van the entire time. A cloud of lingering pepper spray hung in the air the entire time.

87.     Mr. Cantú was detained in the kettle for approximately eight hours. Mr. Wood was detained in the kettle for approximately two to three hours.

88.     By the time Mr. Cantú was formally arrested and transported to a detention facility, he had gone approximately nine to ten hours without access to a toilet.  Mr. Wood went about five to six hours without access to a toilet.

89.     Mr. Cantú was not given food or drink until later in the evening; he was detained an approximate total of twelve hours without being provided food or drink. Mr. Wood was detained approximately nine hours without being provided food or drink.

90.     At some point during his detainment, Mr. Cantú was placed in a room with about a dozen other men and interrogated by several MPD officers about his credentials, personal history, and other irrelevant matters.  Mr. Cantú was forced to provide a urine sample.  Mr. Wood was forced to provide a urine sample.

91.     Neither the officials in charge of the kettle and/or the arrests — Chief Newsham, Asst. Chief Greene, Asst. Chief Alder, Cmdr. Carroll, Cmdr. Deville, and Lt. Niepling — nor arresting officers took any actions to ensure that only individuals whom they had probable cause to believe had committed crimes would be handcuffed and transported to detention facilities.

92.     After his arrest, Mr. Cantú was prosecuted for bogus criminal charges that could have placed him in jail for at least 60 years.  Eventually, he beat all of the charges.  Thereafter, prosecutors around the country dropped other similar types of cases.  Mr. Cantú suffered humiliation and damage to his career and mental health as a result.

93.     Mr. Wood was indicted with bogus criminal charges that could have placed him in prison for 75 years. Mr. Wood went to trial (November 15, 2017-December 21, 2017) and he was acquitted on all charges. Wood was tried by U.S. Justice Department prosecutor Jennifer Kerkoff, who was sanctioned for Brady violations for the inauguration protest trials.

94.     Plaintiffs both suffer PTSD, humiliation, and damage to their mental, emotional, and physical health and career as a result.

*Plaintiff Cantú's Injuries*

95.     As a result of Defendants' unjustified use of pepper spray and other chemical irritants, Plaintiff suffered severe pain as his eyes burned from the pepper spray.  At the time, Mr. Cantú was getting over an eye infection, and the pepper spray made his condition worse.  Mr. Cantú suffered emotional distress from the panic at being trapped and unable to breathe while he was pepper-sprayed during the kettle.

96.     As a result of his arrest without probable cause and in response to his exercise of his First Amendment rights, Mr. Cantú was detained for approximately 33 hours.

97.    As a result of the application of excessively tight zipties, Mr. Cantú experienced pain in his hands and lost feeling in several fingers on both hands. Several fingers on his left hand remained numb for more than four months after his arrest. Because of the numbness, Mr. Cantú had difficulty with important daily tasks, including typing on a keyboard.

98.    As a result of the denial of food, water, and access to a toilet, Mr. Cantú experienced hunger, thirst, discomfort, and anxiety.

99.    As a result of the Defendants' conduct described above, particularly the kettling, Mr. Cantú has suffered bouts of anxiety and has had difficulty sleeping since January 20.  He suffers from nightmares filled with violent imagery and wakes up approximately every three hours, often in a panicked state. Being in large crowds, which is part of his job as a freelance journalist, heightens his anxiety as he remembers what happened to him on January 20.

100.    To this day, Mr. Cantú awakens with nightmares and violent PTSD outbursts.

101.    As a result of the Defendants' conduct described above, particularly the arrest and prosecution of Mr. Cantú, Mr. Cantú suffered economic damages and severe emotional distress as well as damage to his career and reputation.

*Plaintiff Wood's Injuries*

102.    Mr. Wood was pushed to the ground, pepper-sprayed directly in the face, endured stinger grenades, and was arrested on January 20th, 2017, in DC. Wood's equipment was damaged and confiscated affecting Wood's career and ability to make income.

103.    As a result of the Defendants' conduct described above, particularly pepper spray, the kettling, arrest and trial,  Wood has suffered PTSD symptoms, including but not limited to fear, depression, and anger outbursts. Mr. Wood has been inflicted with anxiety since being pepper-sprayed, arrested, and tried. Mr. Wood has suffered crippling depression and homelessness due to

mental and emotional distress. Wood's physical health, including but not limited to change in eating habits, sleep, and exercise, has declined since pepper spray and arrest. Wood's career in photojournalism has ceased due to damages to his career and reputation.

## The District's Responsibility for Plaintiffs' Injuries

104.    The actions of the Defendants described above were taken pursuant to a municipal policy, practice, and custom of responding to demonstrations at which some law-breaking occurs by using excessive force against participants who have not broken the law.

105.    Chief Newsham has acknowledged that the officers' kettling of detainees was not mere happenstance, but a coordinated strategy. All the officers' actions in pepper spraying, assaulting with additional noise- and light-emitting weaponry, and detaining demonstrators were carried out in a coordinated manner.

106.    Chief Newsham spent the day on January 20 in an MPD command center, where he was well aware of and (on information and belief) directed the massive and coordinated MPD response to the march down 13th Street NW, pursuant to MPD Standard Operating Procedure 16-01 ("Handling First Amendment Assemblies and Mass Demonstrations"), which provides (at page 11) that "During periods in which the Department is fully mobilized for mass demonstration operations . . . [t]he Chief of Police, as the commanding official of the MPD, shall oversee all police activities …."

107.    Cmdr. Keith Deville, the officer in command on the scene of the demonstration and subsequent kettling, was in constant communication with the MPD command center, where he received orders from Asst. Chief Lamar Greene and other top-ranking members of MPD.   On information and belief, Asst. Chief Greene and the other officials who instructed Cmdr. Deville

acted on the orders or with the approval of Chief Newsham, who was with them in the command center.

108.    To whatever extent Chief Newsham did not direct the coordinated MPD response himself, he nonetheless was aware of the large-scale MPD actions taken against the individuals who marched down 13th Street NW, and he deliberately failed to supervise and restrain Greene and Deville, and other officers under his command, from violating the rights of Plaintiffs and others repeatedly and continually throughout January 20.

109.    The coordinated MPD response is part of a custom of the District of Columbia of responding with overwhelming and unlawful force to non-violent demonstrators at largely peaceful demonstrations where some law-breaking is occurring. For instance, MPD has:

   *a.*     Used excessive force against and unconstitutionally detained demonstrators during the counter-inaugural demonstrations in Adams Morgan in January 2005; the pepper-spraying and arrest of numerous peaceful demonstrators led to lawsuits resolved by large settlement payments to victims of MPD violence;

   *b.*     Used excessive force against demonstrators during the counter- inaugural demonstrations near the White House in January 2005 after other demonstrators had removed a portion of security fencing; the pepper-spraying of law-abiding demonstrators led to a lawsuit resolved by large settlement payments to victims of MPD violence;

   c.     Used excessive force against and unconstitutionally detained demonstrators during the World Bank protests in Pershing Park in September 2002; the mass arrests and hogtying of protestors led to lawsuits resolved by large settlement payments to victims of MPD violence; and

     d.     Used excessive force against and unconstitutionally detained anti-globalization demonstrators in April 2000; the kettling, use of pepper spray, and denial of food and water to detainees led to lawsuits resolved by large settlement payments to victims of MPD violence.

110.     The prior incidents in which MPD used excessive force against and unconstitutionally detained peaceful demonstrators where some law-breaking occurred made clear to the District that its officers required training regarding the constitutional limits of their authority to detain demonstrators and use force against them. The widespread use of chemical irritants on January 20 in violation of both D.C. law and the Fourth Amendment reflects a deliberately indifferent failure to train MPD officers on the appropriate circumstances in which to deploy chemical irritants. To whatever extent the officers' actions described here did not reflect municipal custom or carry out affirmative instructions from Chief Newsham, these actions were the result of the District's failure to train MPD officers.

111.     When asked to comment on MPD officers' January 20 conduct, Chief Newsham responded by ratifying the officers' conduct in a WTOP radio interview, in which he stated: "[A]ll the police officers were outstanding in the judgment that they used. They used the least amount of force necessary to bring those folks safely and respectfully into custody. I couldn't be more proud of the way this department responded." Chief Newsham further stated to WTOP that he was "very, very pleased" with the way police responded to the demonstration.

112.     Following a report by the Office of Police Complaints raising concerns about MPD's conduct on Inauguration Day, an official MPD spokesperson reaffirmed that its officers' actions conformed to the District's expectations: "The Metropolitan Police Department stands by

its assertion that our officers acted responsibly and professionally during Inauguration Day," MPD spokesperson Rachel Reid said in a statement emailed to the news media.

113.    In accordance with D.C. Code § 12-309, Plaintiff provided written notice of his common law claims to the District of Columbia within six months after the incidents alleged herein.

## CLAIMS FOR RELIEF

### Claim 1: Fourth Amendment / 42 U.S.C. § 1983 – arrest without probable cause

114.    Plaintiffs incorporate by reference paragraphs 1-113 as if stated fully herein.

115.    The actions of Defendants, namely the warrantless arrests of Plaintiffs without probable cause, and the actions of Defendants in ordering or approving such arrests, violated Plaintiff's rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

116.    Defendants are jointly and severally liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of their rights.

117.    Defendant District of Columbia is liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

### Claim 2: First Amendment / 42 U.S.C. § 1983 – arrest for protected speech

118.    Plaintiffs incorporate by reference paragraphs 1-113 as if stated fully herein.

119.    The actions of Defendants, namely the arrest of Plaintiffs for exercising his First Amendment freedoms to report the news or to express his views, respectively, and the actions of Defendants in ordering or approving such arrests, violated the rights of Plaintiff Cantú under the

First Amendment to the United States Constitution, which guarantees the freedoms of speech, assembly, and press.

120.    Plaintiffs engaged in protected conduct by asserting their rights as a reporter on multiple occasions to Defendants.

121.    Defendants retaliated against Plaintiffs by detaining them for many hours without food, water or a bathroom, pepper-spraying him, and arresting them unlawfully.

122.    Plaintiffs' protected conduct was the cause of Defendants' retaliation.

123.    Defendants are jointly and severally liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of his rights.

124.    Defendant District of Columbia is liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of his rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 3: Fourth Amendment / 42 U.S.C. § 1983 – excessive force (use of chemical irritants)**

125.    Plaintiffs incorporate by reference paragraphs 1-113 as if stated fully herein.

126.    The actions of Defendants, namely the use of pepper spray and stingballs against nonviolent and non-resisting demonstrators, detainees, and bystanders, including Plaintiffs, and the actions of Defendants in ordering or approving such use of pepper spray and stingballs, violated the rights of Plaintiffs under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

127.    Defendants are jointly and severally liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of their rights.

128.    Defendant District of Columbia is liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

129.    The actions of Defendants, namely the use of pepper spray and stingballs against nonviolent and non-resisting demonstrators, detainees, and bystanders, including Plaintiffs, constituted the torts of assault and battery.

130.    Defendants are liable for these actions because they ordered their officers to use pepper spray and stingballs against nonviolent and non-resisting demonstrators, journalists, observers, detainees, and bystanders or knew about, condoned, and/or failed to correct this conduct.

131.    Defendants are jointly and severally liable to Plaintiffs for these tortious acts.

132.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 5: Fourth Amendment / 42 U.S.C. § 1983 – excessive force (zipties)**

133.    Plaintiffs incorporate by reference paragraphs 1-113 as if stated fully herein.

134.    The actions of Defendants, namely the excessively and painfully tight handcuffing of Plaintiffs, and the refusal to remove the restraints despite knowing that they were too tight, violated his rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

135.    Defendants are liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for these violations of their rights.

136.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 6: Fourth and Fifth Amendments / 42 U.S.C. § 1983 – unconstitutional conditions of pre-trial confinement**

137.    Plaintiffs incorporate by reference paragraphs 1-113 as if stated fully herein.

138.    The actions of Defendants in ordering or approving the detention of Plaintiff Cantú for a prolonged period without access to food, water or toilets violated Plaintiff's rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures and under the Fifth Amendment to the United States Constitution to due process of law.

139.    Defendants are jointly and severally liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of his rights.

140.    Defendant District of Columbia is liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of his rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 7: Intentional infliction of emotional distress – denial of access to toilets**

141.    Plaintiffs incorporate by reference paragraphs 1-113 as if stated fully herein.

142.    The actions of Defendants, namely ordering or approving the detention of Plaintiff for a prolonged period without access to a toilet, constituted extreme and outrageous conduct that intentionally or recklessly caused Plaintiffs severe emotional distress.

143.    Defendants are jointly and severally liable to Plaintiffs for this tortious act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

(a)   Rule that Defendants' actions violated Plaintiffs' rights under the First, Fourth, and Fifth Amendments to the United States Constitution and the law of the District of Columbia;

(b)   Enter judgment awarding Plaintiffs compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

(d)   Enter judgment awarding Plaintiffs their costs and reasonable attorney's fees in this action as provided in 42 U.S.C. § 1988(b); and

(e)   Grant Plaintiffs such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury.

January 16, 2020                              Respectfully submitted,

                                             */s/ David L. Scher*_____-
                                             HOYER LAW GROUP, PLLC
                                             David L. Scher
                                             District of Columbia Bar No. 474996
                                             dave@hoyerlawgroup.com
                                             HOYER LAW GROUP, PLLC
                                             1300 I Street, N.W., Suite 400E
                                             Washington, DC 20005
                                             Tel: (202) 975-4994 / Fax: (813) 375-3710